## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ICONTROL NETWORKS, INC., a Delaware corporation, | ) ) | CASE NO.:  1:14-cv-01199-GMS |
| | ) | |
| Plaintiff, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| v. | ) | |
| | ) | |
| ZONOFF, INC., a Delaware corporation, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## <u>ICONTROL NETWORKS, INC.'S OPENING CLAIM CONSTRUCTION BRIEF</u>

OF COUNSEL:

James C. Yoon
Ryan R. Smith
Christopher D. Mays
Mary A. Procaccio-Flowers
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1050
(650) 493-9300

Richard K. Herrmann (I.D. No. 405)
Mary B. Matterer (I.D. No. 2696)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

*Attorneys for Plaintiff Icontrol Networks, Inc.*

Dated: January 11, 2016

# TABLE OF CONTENTS

I.    Introduction ............................................................................................................ 1

II.   Legal Standards ..................................................................................................... 3

    A.     Principles of Claim Construction ........................................................... 3

    B.     Indefiniteness ......................................................................................... 5

III.  Claim Terms In Dispute ........................................................................................ 6

    A.     The '690 Patent ...................................................................................... 6

          1.     "control unit for receiving signals from a variety of detection
                 devices monitoring events pertaining to security" ...................... 6

                 a.     The "Control Unit…" Clause is Not Means-Plus-Function .......... 6

                 b.     Zonoff's Proposed Construction Identifies Structures That
                       Are Not Linked to the Claimed Function ...................................... 8

          2.     "control means for actively controlling one or more detection
                 devices" .................................................................................... 9

          3.     "means for transferring information related to the reception of such
                 signals to a remote monitoring station" .................................... 10

          4.     "programmable storage means storing automatic evaluation
                 routines to initiate the automatic transfer of information to a
                 chosen remote user terminal" .................................................. 11

    B.     The '591 Patent .................................................................................... 12

          1.     "proprietary to the security system" ........................................ 13

    C.     The '871 Patent .................................................................................... 14

          1.     "gateway registry" .................................................................. 14

    D.     The '842 Patent .................................................................................... 16

          1.     "autonomous network" ............................................................ 16

          2.     "associative binding" .............................................................. 17

          3.     "an assigned server address" ................................................... 19

4.     "initiating, by the gateway, all communications with a network operations center server using the assigned server address" .................... 20

IV.    Conclusion ..................................................................................................................... 20

# TABLE OF AUTHORITIES

**CASES**

*ACTV, Inc. v. Walt Disney Co.*,
    346 F.3d 1082 (Fed. Cir. 2003)........................................................................16

*AllVoice Computing PLC v. Nuance Communications, Inc.*,
    504 F.3d 1236 (Fed. Cir. 2007)..........................................................................9

*Ancora Technologies, Inc. v. Apple, Inc.*,
    744 F.3d 732 (Fed. Cir. 2014)..........................................................................16

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
    448 F.3d 1324 (Fed.Cir.2006)............................................................................4

*Baran v. Med. Device Techs., Inc.*,
    616 F.3d 1309 (Fed. Cir. 2010)..........................................................................4

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F. 3d 1359 (Fed. Cir. 2002)........................................................................18

*Haemonetics Corp. v. Baxter Healthcare Corp.*,
    607 F.3d 776 (Fed. Cir. 2010)............................................................................5

*Hearing Components, Inc. v. Shure Inc.*,
    600 F.3d. 1357 (Fed. Cir. 2010)..........................................................................5

*Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*,
    222 F.3d 951 (Fed. Cir. 2000)............................................................................4

*Hockerson-Halberstadt, Inc. v. Converse Inc.*,
    183 F.3d 1369 (Fed. Cir. 1999)........................................................................16

*Intel Corp. v. VIA Techs., Inc.*,
    319 F.3d 1357 (Fed. Cir. 2003)..........................................................................9

*JVW Enterprises, Inc. v. Interact Accessories*,
    424 F. 3d 1324 (Fed. Cir. 2005)........................................................................11

*M2M Solutions LLC v. Sierra Wireless Am., Inc.*,
    No. CV 12-30-RGA, 2015 WL 5826816 (D. Del. Oct. 2, 2015)....................7, 8

*Markman v. Westview Instruments, Inc.*,
    52 F.3d 967 (Fed. Cir. 1995)..............................................................................3

*Medrad, Inc. v. MRI Devices Corp.*,
    401 F.3d 1313 (Fed.Cir.2005)........................................................................3

*Merck & Co. v. Teva Pharm. USA, Inc.*,
    395 F.3d 1364 (Fed. Cir. 2005) (Rader, J., dissenting).......................................4

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
    134 S. Ct. 2120 (2014)................................................................................5

*Omega Eng'g, Inc. v. Raytek Corp.*,
    334 F.3d 1314 (Fed. Cir. 2003).................................................................4, 16

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005)........................................................... *passim*

*Power-One, Inc. v. Artesyn Tech., Inc.*,
    599 F.3d 1343 (Fed. Cir. 2010)......................................................................5

*Renishow PLC v. Marposs Societa' Per Azoini*,
    158 F.3d 1243 (Fed. Cir. 1998)......................................................................3

*V-Formation, Inc. v. Benetton Group SpA*,
    401 F.3d 1307 (Fed. Cir. 2005)......................................................................3

*Vitronics Corp. v. Conceptronic, Inc.*,
    90 F.3d 1576 (Fed. Cir. 1996)...................................................................5, 20

*Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*,
    239 F.3d 1225 (Fed. Cir. 2001)..................................................................8, 12

*Williamson v. Citrix Online, LLC*,
    792 F.3d 1339 (Fed. Cir. 2015)................................................................4, 6, 7

**STATUTES**

35 U.S.C. § 112(b) ...............................................................................................5

35 U.S.C. § 112, para. 6..............................................................................4, 6, 8, 12

## I.      INTRODUCTION

Plaintiff Icontrol Networks, Inc. ("Icontrol") submits this Opening Claim Construction brief to assist the Court in construing the disputed claim terms from United States Patent Nos. 6,624,750 ("the '750 patent"), 7,262,690 ("the '690 Patent"), 8,335,842 ("the '842 Patent"), 8,612,591 ("the '591 Patent"), 8,478,871 ("the '871 Patent"), and 8,638,211 ("the '211 patent") (collectively, the "Asserted Patents").[1]  These Asserted Patents generally relate to technology used to enhance home security and home automation.

By way of background, traditional home security systems included a security panel with security sensors on windows and doors as well as motion sensors.  These systems used a phone line to connect the security panel to a central monitoring station.  When armed, the system security panel monitored the security sensors.  If the state of a sensor changed (*e.g.*, a door opened or motion was detected), the armed security panel notified the central monitoring station of the change.  Personnel at the central monitoring station assessed the change in sensor state and, in some cases, attempted to contact the homeowner and/or the police or fire departments because the change indicates an alarm condition.

ADT has long been the largest home security company.  At least historically, it is the only such company with a nationwide footprint in remote home-security monitoring.   ADT sells home security panels and sensors bundled with remote monitoring service plans.  By doing so, ADT is able to sell the hardware at a low up-front price and gradually recoup the cost through the homeowner's monthly subscription fee.  ADT achieves its profits by maintaining and growing a large subscriber base.  The basic home security technology and the underlying

---

[1] The Asserted Patents with claim terms for construction are attached as <u>Exhibit 1</u> (the '690 Patent), <u>Exhibit 2</u> (the '591 Patent), <u>Exhibit 3</u> (the '871 Patent), and <u>Exhibit 4</u> (the '842 Patent).

business model have stayed virtually the same since at least the 1980s. Cable operators and telephone companies have recently entered the home security business utilizing a business model similar to ADT's model.

Home automation refers to technology for automating functions and tasks within one's home, such as using computer software or a smart phone app to turning on or off lights without the need to manually flip a switch. The idea of home automation dates back to the 1970s. Unfortunately, the technology at the time, called X.10, was complicated, expensive, and unreliable. As such, home automation was, for decades, relegated to hobbyists.

Founded in 2003, Icontrol sought to reinvigorate home-automation, and attracted investment from some of the most prominent venture capitalists. Icontrol used this capital to fund research and development. These research efforts focused on integrating home automation and home security technology. This integration presented numerous technical challenges, which took years to overcome.

Based, in part, on the claimed inventions at issue in this case, Icontrol overcame those technical challenges and released its initial product in the spring of 2006. That platform incorporated support for home security devices, video-cameras, and home automation. Then, in 2007, Icontrol demonstrated an integration of its gateway with a pre-existing security panel. Those that witnessed the demonstration were amazed that Icontrol's gateway could reliably and elegantly transform a traditional security panel into a powerful Internet connected home automation system. For example, using Icontrol's system a homeowner could arm (or disarm) her traditional security panel and could also control lighting remotely through a web-interface on her computer. A homeowner could also use security-related events, such as a door opening, to control home automation events such as turning on a light.

In early 2009, Icontrol began providing its home automation platform into ADT's pre-existing security systems.  ADT launched this new offering, branded "ADT Pulse", in October 2010.  By exclusively relying on Icontrol's technology, ADT enjoyed substantial success from this new product.

Zonoff was founded in April 2011 and now seeks to replace Icontrol in ADT's product.  Zonoff contends that it does not infringe the Asserted Patents, but has steadfastly refused to explain the basis for its non-infringement defense.  Zonoff's defense does, however, appear based on its incorrect interpretation of disputed certain claims of the Asserted Patents, as explained below.

## II.    LEGAL STANDARDS

### A.    Principles of Claim Construction

Claim construction is a question of law exclusively within the province of this Court.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995).  The claim construction process "begins and ends in all cases with the actual words of the claim."  *Renishow PLC v. Marposs Societa' Per Azoini*, 158 F.3d 1243, 1248 (Fed. Cir. 1998).  "[W]ords of a claim 'are generally given their ordinary and customary meaning.'"  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citations omitted).  Moreover, "the person of ordinary skill in the art is deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification."  *Id.* at 1313; *see also Medrad, Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed.Cir.2005) ("We cannot look at the ordinary meaning of the term . . . in a vacuum.  Rather, we must look at the ordinary meaning in the context of the written description and the prosecution history."); *V-Formation, Inc. v. Benetton Group SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005) (intrinsic record

"usually provides the technological and temporal context to enable the court to ascertain the meaning of the claim to one of ordinary skill in the art at the time of the invention").

Also, when construing a means-plus-function claim, "the district court must first determine the claimed function and then identify the corresponding structure in the written description of the patent that performs that function." *Baran v. Med. Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010) (*citing Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed.Cir.2006).  When the claim term lacks the word 'means', the term will be construed to be a means-plus-function term if the term "fails to recite sufficiently definite structure, or else recites function without reciting sufficient structure for performing that function." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015). Construction of the term in light of the specification or prosecution history may also provide "a sufficiently definite structure as to take the overall claim limitation out of the ambit of § 112, para. 6." *Id.* at 1351.

The Federal Circuit has established a "hierarchy" wherein courts should analyze the intrinsic record of the patent—the claim language, the specification, and the prosecution history—in determining the proper construction of a disputed claim term.  *See, e.g., Hockerson-Halberstadt, Inc. v. Avia Group Int'l, Inc.*, 222 F.3d 951, 955 (Fed. Cir. 2000).  "If the meaning of a claim is unambiguous from the intrinsic evidence, then a court may not rely on extrinsic evidence for purposes of claim construction." *Id.*

"[A]lthough the specification often describes very specific embodiments of the invention, [the Federal Circuit has] repeatedly warned against confining the claims to those embodiments." *Phillips*, 415 F.3d at 1323.  Unless the specification "clearly, deliberately, and precisely" spells

out how a claim term is to be used, the plain and ordinary meaning controls. *Merck & Co. v. Teva Pharm. USA, Inc.*, 395 F.3d 1364, 1379 (Fed. Cir. 2005) (Rader, J., dissenting).

Although the prosecution history may inform claim construction, "for prosecution disclaimer to attach, [Federal Circuit] precedent requires that the alleged disavowing actions or statements made during prosecution be both clear and unmistakable." *Omega Eng'g, Inc. v. Raytek Corp.*, 334 F.3d 1314, 1325-26 (Fed. Cir. 2003). Moreover, although the prosecution history may be used in construing claims, it "often lacks the clarity of the specification and thus is less useful for claim construction purposes." *Phillips*, 415 F.3d at 1317.

Finally, while extrinsic evidence may be used to confirm the proper meaning of a claim term, it is not proper to rely on extrinsic evidence where the intrinsic evidence alone resolves any ambiguity. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

### B.      Indefiniteness

Defendants bear the burden of establishing by clear and convincing evidence that a claim term is indefinite under 35 U.S.C. § 112(b). *Haemonetics Corp. v. Baxter Healthcare Corp.*, 607 F.3d 776, 783 (Fed. Cir. 2010). A claim is indefinite only "if its claims, read in light of the patent's specification and prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2123 (2014). A claim should not be found indefinite just because it poses a difficult issue of claim construction. *Power-One, Inc. v. Artesyn Tech., Inc.*, 599 F.3d 1343, 1350 (Fed. Cir. 2010). The definiteness of claim terms depends on whether the terms in question can be given any reasonable meaning to those skilled in the art giving scope or bounds to the claim. *Hearing Components, Inc. v. Shure Inc.*, 600 F.3d. 1357 (Fed. Cir. 2010).

III.    **CLAIM TERMS IN DISPUTE**

A.      **The '690 Patent**

The '690 Patent is entitled "METHOD AND SYSTEM FOR MONITORING EVENTS."

It lists Michael Heaton, Jonathan Beardmore, and Andrew Eccleston as the inventors.  The

patent, which was originally assigned to a company called Mygard PLC, stems from an

application filed in Great Brittan on January 30, 2001 and a Patent Cooperation Treaty ("PCT")

application filed one-year later.  The U.S. application was filed on May 13, 2004 and published

on September 30, 2004.

1.      **"control unit for receiving signals from a variety of detection devices
monitoring events pertaining to security"**

The parties dispute whether or not this is a means-plus-function clause.  To the extent that

it is means-plus-function, the parties also dispute which structures correspond to the function.

a.      **The "Control Unit…" Clause is Not Means-Plus-Function**

The Federal Circuit recently confirmed that "[w]hen a claim term lacks the word 'means,'

... § 112, para. 6 [means-plus-function] will apply if the challenger demonstrates that the claim

term fails to 'recite sufficiently definite structure' or else recites 'function without reciting

sufficient structure for performing that function.'" *Williamson*, 792 F.3d at 1349.  Because the

"control unit..." term of the '690 patent does not include the word "means," Zonoff bears the

burden of showing that 35 U.S.C. § 112, para. 6 applies.  Zonoff cannot meet its burden because

it asks this Court to commit legal error in two ways: (1) Zonoff seeks to have the term "control

unit" analyzed without reference to the specification of the patent and (2) Zonoff asks the Court

to ignore the nature and structure of the claim where the term "control unit" appears.

First, in interpreting the meaning of "control unit" to a person of ordinary skill, the

Federal Circuit has made clear that a person of ordinary skill is deemed to read the term not only

in the context of the claim but also in the context of the entire patent, including the specification. *Phillips*, 415 F.3d at 1313-1314. Such a person of ordinary skill would clearly understand that the term "control unit" denotes structure and is not the type of nonce word that would convert the term into a means-plus-function element. *Williamson*, 792 F.3d at 1349, 1351.

For example, Figure 1 of the '690 patent provides a block-diagram of the inventive system, including an "Alarm Control Unit (ACU)." The specification goes on to describe an embodiment where the "control unit" "may be connected by wires or may be in wireless communication." Exhibit 1, '690 Patent, 2:27-29. The specification further describes an embodiment where "interface units may be considered part of the local control unit..." *Id.* at 2:29-31. The specification goes on to teach that "[a]n ACU may provide a common interface for alarm signals generated in response to events detected by the detectors. For instance, the ACU may detect any alarm signal outputs from the detectors and transmit the information relating to such signals to the AMS [Automatic Monitoring Station]. Alternatively the ACU may monitor and log alerts/information relating to such signals, transmitting the information when interrogated by the AMS." *Id.* at 2:50-57. The specification also includes a "glossary" of terms, defining "Alarm Control Unit" as "a local control unit provided at a monitored site. The ACU is adapted to receive signals generated in response to events by detection devices also located at the monitored site, process the signals and transmit information relating to the received signals to a remote monitoring station." Exhibit 1, '690 patent, col. 5.

Second, even if the Court concludes that "control unit," in isolation, does not connote sufficient structure, the nature and structure of the claim where the term "control unit" appears cannot be disregarded. The Court recently faced this issue in *M2M Solutions LLC v. Sierra Wireless Am., Inc.*, No. CV 12-30-RGA, 2015 WL 5826816 (D. Del. Oct. 2, 2015). In that case,

the Court concluded that "it is probably the case that the word 'processing' by itself fails to provide sufficient structure in the term 'processing module,'" but the entire claim limitation *in context* recited sufficient structure.  *Id.* at \*2.

Similar to the *M2M Solutions* case, claim 1 states that the "control unit having [1] means for transferring information related to the reception of such signals to a remote monitoring station and having [2] control means for actively controlling one or more detection devices." Exhibit 1, '690 Patent, 18:27-30.  The "control unit" must therefore include both the "means for transferring…" and the "control means…."  As explained below, both of those claim terms are subject to § 112, para. 6 and both are clearly linked to structures disclosed in the '690 patent's specification.  By extension, claim 1 requires that the "control unit" include at least the structure for the "means for transferring" and the structure for the "control means."  The term "control unit…" is not a means-plus-function clause since it includes at least these additional structures.

### b.    Zonoff's Proposed Construction Identifies Structures That Are Not Linked to the Claimed Function

To the extent that the Court construes "control unit…" as a means-plus-function clause, Zonoff's proposed construction should be rejected because it identifies structures that are not needed to perform the recited function.  The Federal Circuit has held that "[u]nder § 112, ¶ 6, a court may not import . . . structural limitations from the written description that are unnecessary to perform the claimed function."  *Wenger Mfg., Inc. v. Coating Mach. Sys., Inc.*, 239 F.3d 1225, 1233 (Fed. Cir. 2001).

According to Zonoff, the function is "receiving signals from a variety of detection devices monitoring events pertaining to security."  Zonoff goes on to identify numerous structures having nothing to do with "receiving signals."  For instance, Zonoff identifies "a speaker 520, user interface controls 506, a low power radio transmitter 507," a "battery backup

518," and "resistors, capacitors, and logic elements."  These structures do not perform the

function of "receiving signals from a variety of detection devices monitoring events pertaining to

security" and thus do not constitute structure corresponding to this function.

> **2.      "control means for actively controlling one or more detection devices"**

The parties agree that this term is a means-plus-function clause.  Zonoff contends that the

clause is indefinite because the specification allegedly lacks any structure corresponding to the

recited function.  Zonoff's position is at odds with patent law.

 Specifically, "a means-plus-function clause is indefinite if a person of ordinary skill in

the art would be unable to recognize the structure in the specification and associate it with the

corresponding function in the claim."  *AllVoice Computing PLC v. Nuance Communications,*

*Inc.*, 504 F.3d 1236, 1241 (Fed. Cir. 2007).  Because patents are presumed valid, Zonoff must

prove any fact critical to a holding on indefiniteness by clear and convincing evidence.  *See Intel*

*Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1366 (Fed. Cir. 2003).  Zonoff falls far short of

meeting it burden, as explained below.

The plain language of claim 1 indicates that the "control means" performs the function of

"actively controlling one or more detection devices."   Claim 1 further requires that the "control

mean" be a component of the "control unit."  The control unit is depicted in Figures 5 and 6 of

the '690 Patent.  The '690 Patent specifically discloses a "microphone"—which detects sound—

as an example of a detection device.  As shown in Figure 5, the exemplary processor (500) uses a

"Dual Monostable" circuit (503) to turn "on/off" the output of the amplified output of the

microphone (502).  As an alternative to the dual monostable circuit, the '690 Patent also

discloses an "electronic timing switch."  "The effect of this switch is to disable the microphone

(502) for a short period (e.g. 0.5 seconds), then enable it for a short period (e.g. 1.5 seconds), and

then disable it for a short period again." Exhibit 1,'690 Patent, 16:54-57.  The '690 Patent

discloses a variety of other detection devices, such as a temperature detector and video, which

detects images.  *Id.* at 4:1-27.

Based on at least the above-discussed portions of the '690 patent, a person of ordinary

skill in the art would recognize that the portion of the Alarm Control Unit, which enables and

disables the output of the detection device (*e.g.,* the dual monostable or electronic switch) is the

structure corresponding to the "control means" function.  Zonoff has therefore failed to meet its

burden of proving indefiniteness by clear and convincing evidence.

### 3. "means for transferring information related to the reception of such signals to a remote monitoring station"

The parties agree that this term is a means-plus-function clause.  Zonoff again

erroneously asserts that this clause is indefinite because the specification lacks any structure

corresponding to the recited function.

The function for this means-plus-function clause is "transferring information related to

the reception of such signals to a remote monitoring station," where "such signals" refers to

previously recited "signals from a variety of detection devices."  Hence, the function requires

transferring information related to the reception of signals from a variety of detection devices to

a remote monitoring station.  The specification discloses structures for performing this function.

For example, the specification discusses an example where the microphone is used to detect "the

sound of an alarm sounding" by comparing it to a pre-recorded alarm sound.  Exhibit 1,'690

Patent, 16:63-66.  "If the two sounds match then the generated signals receiving unit sends a

signal to the part of the ACU adapted to transmit information relating to the generated signals to

the AMS, **using the low power radio transmitter** (507)."  *Id.* at 17:1-5 (emphasis added); *see*

*also* Figs. 5, 6; and 18:13-19.

Based on at least the above-discussed portions of the '690 patent, a person of ordinary skill in the art would recognize that "the low power radio transmitter" is the structure corresponding to the "means for transferring...." function. Zonoff has again failed to meet its burden of proving indefiniteness by clear and convincing evidence.

> **4.      "programmable storage means storing automatic evaluation routines to initiate the automatic transfer of information to a chosen remote user terminal"**

The parties agree that this term is a means-plus-function clause, but disagree regarding its function and further disagree regarding the structure.

Regarding the former, Icontrol is of the view that the function is recited in the claim language itself. In particular, claim 1 states that the "programmable storage means" performs the function of "storing automatic evaluation routines to initiate the automatic transfer of information to a chosen remote user terminal." For example, the specification explains that the "Alert Generation Database" "oversees the transmission of message to Alert Recipients (700) if no disarm has taken place. The AMS (100) may, in response to an Alert, identify that various Alert Recipients (700) need to be informed and the address where the alert has been activated." Exhibit 1,'690 Patent, 8:25-29. "The Alert Recipient may be, but not essentially be, the user." *Id.* at 12:48-50. In other words, identifying recipients and initiating the sending of alerts to those recipients is an example of the recited function.

Zonoff, in contrast, "adopt[s] a function different from that explicitly recited in the claim" thereby violating the fundamental tenet governing the determination of function in a means-plus-function limitations. *JVW Enterprises, Inc. v. Interact Accessories*, 424 F. 3d 1324, 1331 (Fed. Cir. 2005). Indeed, Zonoff seeks to construe the function to require "storing routines that allow the monitoring station to identify events detected by detection devices and initiate an automatic transfer of information **determined by the nature of the identified event to a chosen**

-11-

**remote user terminal**" (emphasis added).  The recited function does not, for instance, require

that the information transferred to the chosen user terminal be determined (or selected) in any

particular manner.  Rather, the function requires only that the automatic evaluation routines have

the capability to initiate automatic transfer of some information to a chosen remote user terminal.

This is simply an attempt to read a limitation from the specification into this claim term,

something the Federal Circuit has repeatedly warned against.  *See Phillips*, 415 F.3d at 1323.

Zonoff's attempt to adopt a function different from that explicitly recited in the claim language

should be rejected.

Turning to the dispute regarding structure, the parties agree that the non-volatile memory

storing the Alert Generation Database constitutes structure corresponding to this means-plus-

function clause.  Icontrol contends that this structure is sufficient because the Alert Generation

Database includes the automatic evaluation routines which identify the recipients (users) of

alerts.  In fact, as shown in Figure 2, it is the Alert Generation Database (104) that provides

information to "Alert Recipients" through an "IP" connection.  And since the non-volatile

memory storing the Alert Generation Database stores automatic evaluation routines to initiate the

automatic transfer of information to a chosen remote user terminal, Zonoff's attempt to include

additional structure should be rejected.  *Wenger*, 239 F.3d at 1233 ("Under § 112, ¶ 6, a court

may not import . . . structural limitations from the written description that are unnecessary to

perform the claimed function.").

### B.     The '591 Patent

The '591 Patent is entitled "NETWORKED TOUCHSCREEN WITH INTEGRATED

INTERFACES."  It lists Paul Dawes, Jim Fulker, and Carolyn Wales as the inventors.  On its

face, the '591 Patent identifies numerous priority patent applications, including U.S. Patent

Application Nos. 60/955,172; 60/957,997 and 60/968,005 which were filed on August 24, 2007.

The '591 Patent was filed on August 25, 2008 and issued on December 17, 2013.

## 1.    "proprietary to the security system"

Icontrol's proposed construction of this term is "used only with the security system."

This construction is appropriately supported by the specification.  The claimed invention is

designed to integrate into—and complement—existing home security systems.  *See* <u>Exhibit 2</u>,

'591 Patent 3:52-4:2.  However, as the specification discloses, a traditional problem with

integrating with and complementing existing home security systems is that such security systems

typically utilize proprietary protocols designed to have little or no ability to operate outside any

respective system provider's security system.  *See id.* at 1:63-67.  The '591 Patent seeks to

overcome this traditional limitation by providing an "open systems solution" that "abstract

devices" by "utilizing the proprietary wireless protocols of the security system manufacturer."

*Id.*  at 5:5-10 and 28:26-29.  Put another way, the claimed invention provides a layer of

abstraction that enables the integration of devices used only with their respective security

systems.  *See id.* at 5:5-10; *see also* 4:22-40; 4:47-54; 5:5-44; 20:32-44; Figures 16 and 17.

Zonoff's proposed construction ("useful only with the security systems of the same

vendor") should be rejected because it contradicts the specification.  <u>First</u>, the intrinsic record

dictates that while a proprietary component must be ***used*** with the security system, the ability to

integrate multiple devices extends the ***usefulness*** of any proprietary component beyond the

security system.  *See* <u>Exhibit 2</u>,'591 Patent, 4:22-40 (discussing how the invention "extend[s] the

value of traditional home security").  <u>Second</u>, Zonoff's requirement that proprietary components

can only be useful with security systems "of the same vendor" is unsupported because the claims

and specification recite only a "security system," not a "security system of the same vendor."  *Id.*

54:25-31 (Claim 57); *see also* 41:10-27; 44:40-53; 47:35-52; and 49:34-47.  Indeed, nothing in

the specification indicates that a component is proprietary only if it is provided by a single

vendor, and such a requirement would render the scope of the claim arbitrary and amorphous,

requiring pointless inquiry into business records to determine whether a product comes from a

single vendor.  At base, the "of the same vendor" phrase is simply superfluous language that

unnecessarily and improperly narrows the scope of the claim.

### C.    The '871 Patent

The '871 Patent is entitled "GATEWAY REGISTRY METHODS AND SYSTEMS."  It

lists Gerald Gutt and Aaron Wood as the inventors.  On its face, the '871 Patent claims priority

to U.S. Patent No. 7,711,796 (filed June 12, 2007) and U.S. Provisional Application No.

60/804,550 (filed June 12, 2006).  The '871 Patent was filed on December 14, 2009, and issued

on July 2, 2013.

### 1.    "gateway registry"

Icontrol's proposed construction of this term is "a server component that maintains

records relating to the gateways."  This construction is appropriate when the term is read in light

of the claims, which are intrinsic evidence of the term's meaning.  For example, Claim 1

explains that the gateway device's logic sends "a request to a gateway registry" that specifies a

serial number of the gateway device.  Exhibit 3,'871 Patent, 20:59-61.  However, in the separate

embodiment of Claim 15, the gateway registry includes "logic that determines an identification

of the account using a serial number of the gateway device, and communicates to the gateway

device the identification and a server address of a server that includes the account information."

*Id.* at 21:43-47.  Dependent Claims 18-20, 28, and 29 each identify further distinct embodiments

for the gateway registry.  *Id.* at 21:59-67; 22:21-28.  The context in which the "gateway registry"

is used in these claims supports Icontrol's construction that the gateway registry is "a server

component that maintains records relating to the gateways."  *See Phillips*, 415 F.3d at 1314

(finding "the claims themselves provide substantial guidance as to the meaning of particular claim terms" and "the context in which a term is used . . . highly instructive."). The specification identifies further additional embodiments that, when taken together, further support Icontrol's construction. *See* Exhibit 3, '871 Patent, 2:19-23; 3:6-22; 4:11-33 and 47-53. In short, the gateway registry is a versatile data structure optionally containing many different types of information regarding the gateway. Moreover, the specification explains that these embodiments are exemplary, and that "other arrangements are contemplated and described herein." *Id.* at 3:38-39.

Zonoff's proposed construction improperly applies one embodiment of the gateway registry to the exclusion of all others. Zonoff's construction requires that the gateway registry "associate a serial number of a specific gateway device with an address of a specific gateway server and an account" – no more and no less. This construction, however, is overly narrow because it ignores the many embodiments disclosed in the claims and the specifications identified above. For example, Zonoff's construction requires the gateway registry to store serial numbers, addresses, ***and*** account information, while various embodiments of the claims and specification require less than all three types of information. *See also id.* at 3:6-10 (using "and/or"). Requiring the gateway registry to associate all three elements together improperly narrows the term and ignores the intrinsic teachings of the claims and the specification. Moreover, Zonoff's construction renders superfluous Claims 18-20, each of which identify a different embodiment of the gateway registry that stores different information. *Id.* at 21:59-61 (Claim 18 – storing serial numbers); 21:62-64 (Claim 19 – storing identifications of a plurality of accounts); 21:65-67 (Claim 20 – storing server addresses). That each of these claims uses different terminology to claim the gateway registry supports Icontrol's broader construction. *See*

*Ancora Technologies, Inc. v. Apple, Inc.*, 744 F.3d 732, 735 (Fed. Cir. 2014) ("the difference in terminology tends to reinforce, rather than undermine, adoption of the broad ordinary meaning of 'program' by itself").

### D.      The '842 Patent

The '842 Patent is entitled "PREMISE MANAGEMENT NETWORKING."  It lists Reza Raji and Gerald Gutt as the inventors.  On its face, the '842 Patent claims priority to U.S. Provision Application Nos. 60/553,934 (filed March 16, 2004); 60/553,932 (filed March 16, 2004); and 60/652,475 (filed Feb. 11, 2005).  The '842 Patent was filed March 16, 2005, and issued on December 18, 2012.

### 1.      "autonomous network"

Icontrol's proposed construction for this term is "separate and distinct from other networks of the plurality of networks," the plain and ordinary meaning of the term.  Indeed, this construction is taken *verbatim* from the text of Claims 1 and 14.  *See* Exhibit 4,'842 Patent, 27:30-38 (claim 1); 28:20-33 (claim 14).  Icontrol's construction comes directly from the language of the claims, and nothing in the specification can overcome the heavy presumption that the term carries its plain and ordinary meaning.  *See Omega Eng'g*., 334 F.3d at 1323 ("We indulge a 'heavy presumption' that claim terms carry their full ordinary and customary meaning unless the patentee unequivocally imparted a novel meaning to those terms or expressly relinquished claim scope during prosecution"); *ACTV, Inc. v. Walt Disney Co.*, 346 F.3d 1082, 1090 (Fed. Cir. 2003) (*quoting Hockerson–Halberstadt, Inc. v. Converse Inc.*, 183 F.3d 1369, 1374 (Fed. Cir. 1999) ("Proper claim construction, however, demands interpretation of the entire claim in context, not a single element in isolation.").

Nothing in the specification suggests that the meaning of "autonomous network" should be anything other than what is identified in Claims 1 and 14.  Indeed, this clearly understood

meaning from the claims is supported by the specification itself.  The specification describes the gateway as being "self-sustaining and autonomous," meaning it can operate on its own, separate and distinct from other networks.  <u>Exhibit 4</u>,'842 Patent, 12:10.

Zonoff's construction disregards the language of the '842 Patent's claims and specification.  Claims 1 and 14 do not equate "autonomous" with "independent," but instead describe "an autonomous network that is **<u>separate and distinct</u>** from any other network of the plurality of networks."  *Id.* at 27:30-38 (claim 1) and 28:20-33 (claim 14) (emphasis added).[2] Nor does the specification describe an "autonomous network" as one that is "independent." Instead, the specification describes a gateway network that is "self-sustaining" and "autonomous" but not independent.  As such, properly construed, an "autonomous network" is "separate and distinct from other networks of the plurality of networks."

### 2.      "associative binding"

Icontrol's proposed construction for this term is "coupling the output of one device (a sensor) to another device (an actuator)."  Icontrol's proposed construction is appropriate because here the inventors acted as their own lexicographer.  The specification provides a definition of the term "associative binding"; at Column 18, lines 30 – 33, it states:

> Associative Binding
>
> Binding is the process of "connecting" the output of one device (a sensor) to another device (actuator).

The specification then provides an example of an associative binding: "a switch that triggers a light to go on."  *Id.*  This statement "clearly set[s] forth a definition of the disputed claim term in

---

[2] Tellingly, Zonoff has not contended that the phrase "that is separate and distinct from any other network of the plurality of networks" requires construction, and Zonoff has provided no justification from departing this (indisputably) clear meaning of "autonomous network."

either the specification or prosecution history" and therefore governs.  *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F. 3d 1359, 1366 (Fed. Cir. 2002).  Moreover, the specification and figures support adopting this construction.  See Figure 10 as one example:



This Figure depicts the output of Device 1 (shown as Sensor Data at①,③, and ⑤) being coupled to the input of Devices 2 and 3 (shown as Actuator Data at ②, ⑤, and ④) via the Gateway.  Zonoff's proposed construction ("a connection mechanism on the gateway that maps source device properties+values to destination device properties+values without containing code to do data conversion from the source device's data format to the destination device's data format) is incorrect for two reasons.  First, Zonoff's construction departs from the inventors' own definition without justification.  Second, Zonoff's construction contradicts a preferred embodiment of the specification by asserting that "associative binding" is "a connection mechanism on the gateway."  The specification discloses that the "associative binding **uses** the gateway itself as the 'connection' mechanism."  Exhibit 4, '842 Patent, 18:36-37 (emphasis added).  The specification does not disclose that the associative binding *is* the connection mechanism, as Zonoff suggests.  Zonoff's proposed construction misstates the specification,

providing an independent basis for rejecting it.  The Court should therefore adopt Icontrol's proposal.

### 3.    "an assigned server address"

Icontrol's proposed construction for this term is "an address assigned by a server", a construction supported by the claims and specification.  Each use of the term "assigned server address" in the claims and specification describes the assignment of an address by a server.  *See id.* at 27:43-46 (Claim 1); *see also* 10:64-67.  For example, the Claim 14 describes how the gateway obtains the assigned server address and uses that assigned server address for all subsequent uplink connections unless the assigned server address is changed.  *Id.* at 28:38-42; *see also* 27:43-55 (corresponding operations in Claim 1).  Similarly, the specification describes how the gateway will contact a common server for its first uplink connection and obtain an assigned gateway server address used for subsequent uplink connections.  *Id.* at 10:64-67.  The gateway may receive a new assigned server address after the initial uplink by contacting this common server again.  *Id.* at 10:64-11:3.

Zonoff's proposal does not dispute that the address is assigned by the server.  Rather, Zonoff's proposal inserts a new limitation that a server address must be assigned to the gateway ***prior to*** the first uplink connection.  Zonoff's construction contradicts the specification.  As discussed above, the specification discloses that the gateway only obtains an assigned server address ***after*** the first uplink connection made to the common server.  <u>Exhibit 4</u>,'842 Patent, 10:64-67.  Moreover, Zonoff's construction contradicts Claims 1 and 14, both of which expressly claim that the assigned server address can be changed after the first uplink connection.  *Id.* at 27:43-46; 28:38-42; *see also* 10:67 ("unless changed later by the system").  For these reasons, Icontrol's proposed construction should be adopted and Zonoff's proposal rejected.

####        4.        "initiating, by the gateway, all communications with a network
####                  operations center server using the assigned server address"

Icontrol's proposed construction of this term is "when the gateway initiates communications with a network operations center, the gateway does so using the assigned server address." The plain language of the claims supports this construction. For example, Claims 1 and 14 recite that the assigned server address is used "for all subsequent uplink connections unless the assigned server address is changed later by the system." *Id.* at 27:43-46; 28:40-42. These claims recite that the gateway contains data and/or instructions to enable it to initiate all communications with the network operations center server using the assigned server address. *Id.* at 27:47-49; 28:43-44. The specification further supports Icontrol's proposal. *See id.* at 10:59-11:3 ("Gateways can contact a common server for their first uplink connection in order to obtain their assigned gateway server address, which they can use for all subsequent uplink connections (unless changed later by the system).").

Zonoff seeks to introduce the artificially narrow limitation that ***all*** communications between the gateway and the NOC server be initiated by the gateway. This limitation ignores embodiments disclosed in the specification. *See* Exhibit 4,'842 Patent, 10:29-31 ("the server can 'call' a gateway if the user requests that a variable change be propagated to a device in real-time (rather than waiting for the next gateway uplink connection on)"). Outcomes that ignore embodiments of the specification are "rarely, if ever, correct." *Vitronics*, 90 F.3d at 1583. For this reason, the Court should adopt Icontrol's proposal and reject Zonoff's proposal.

## IV.       CONCLUSION

For the foregoing reasons, Icontrol requests that the Court adopt Icontrol's proposed constructions.

Dated:  January 11, 2016

    _/s/ Mary B. Matterer_
Richard K. Herrmann (I.D. No. 405)
Mary B. Matterer (I.D. No. 2696)
MORRIS JAMES LLP
500 Delaware Avenue, Suite 1500
Wilmington, DE  19801
(302) 888-6800
rherrmann@morrisjames.com
mmatterer@morrisjames.com

*Attorneys for Plaintiff Icontrol Networks, Inc.*

OF COUNSEL:

James C. Yoon
Ryan R. Smith
Christopher D. Mays
Mary A. Procaccio-Flowers
WILSON SONSINI GOODRICH & ROSATI, P.C.
650 Page Mill Road
Palo Alto, CA 94304-1050
650-493-9300