IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| ICONTROL NETWORKS, INC., a Delaware corporation, <br><br> Plaintiff. <br><br> v. <br><br> ZONOFF INC., a Delaware corporation <br><br> Defendant. | ) ) ) ) ) ) ) Civil Action No. 14-1199-GMS ) ) ) ) ) ) |

### ORDER CONSTRUING THE TERMS OF U.S. PATENT NOS. 7,262,690, 6,624,750, 8,612,591, 8,478,871, 8,638,211, and 8,335,842

After considering the submissions of the parties and hearing oral argument on the matter, IT IS HEREBY ORDERED, ADJUDGED, and DECREED that, as used in the asserted claims of U.S. Patent Nos. 7,262,690 ("the '690 patent"), 6,624,750 ("the '750 patent"), 8,612,591 ("the '591 patent"), 8,478,871 ("the '871 patent"), 8,638,211 ("the '211 patent"), and 8,335,842 ("the '842 patent"):[1]

1. The term **"control unit for receiving signals from a variety of detection devices monitoring events pertaining to security"** is construed to have its plain and ordinary meaning, wherein the term **"control unit"** is construed to mean "ACU 50, which includes an RSC300 chip 500, a microprocessor 510, non-volatile Flash memory 501, a microphone 502 with a dual monostable 503 to control its operation and an automatic gain control 504, a speaker 520, user interface controls 506, a low power radio transmitter 507, an 868 MHz low power radio receiver, a power supply

---

[1] The court does not, at this time, address the parties' invalidity contentions.

with battery backup 518, a modem 519, resistors, capacitors, and logic elements."[2]

2. The term "**programmable storage means storing automatic evaluation routines to initiate the automatic transfer of information to a chosen remote user terminal**" is construed as a means plus-plus-function term. The function is "storing routines that allow the monitoring station to identify events detected by detection events and initiate an automatic transfer of information to a chosen remote user terminal," and the corresponding structure is "a combination of Alarm Monitoring System 102, Alarm Control Unit Configuration Database 103, and Alert Generation Database 104."[3]

---

[2] The defendant argues that this term should be construed as a means-plus-function term under § 112 ¶ 6. To avoid application of § 112 ¶ 6, a term must be "understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1349 (Fed. Cir. 2015). Nonce words such as "module," "element," or "device" are "nothing more than verbal constructs" that are equivalent to using the words "means" in a claim. *Id.* at 1350. If the term does not denote structure, the court must then look to the specification to find corresponding structure.

The defendant argues that "control unit" is a nonce word that fails to recite sufficiently definite structure. The plaintiff responds that a person of ordinary skill would find that "control unit" has sufficient structure when viewed in light of the specification. The '690 patent identifies the local control unit as the Alarm Control Unit ("ACU"). It describes the structure of the ACU in detail at 16:21–33. The court finds that the patent sufficiently defines and provides structure for the ACU.

The defendant's proposal for corresponding structure highlights the problem with applying § 112 ¶ 6 to this term. The corresponding structure for a means-plus-function term must be clearly linked to the function recited in the claim. *Williamson*, 792 F.3d at 1352. The defendant asserts the function is "receiving signals from a variety of detection devices monitoring events pertaining to security," and the corresponding structure is "ACU 50 which includes an RSC 300 chip 500, a microprocessor 510, non-volatile Flash memory 501, a microphone 502 with a dual monostable 503 to control its operation and an automatic gain control 504, a speaker 520, user interface controls 506, a low power radio transmitter 507, a 868 MHz low power radio receiver, a power supply with battery backup 518, a modem 519, resistors, capacitors, and logic elements." The defendant obtained this corresponding structure from the specification's description of "control unit." But many of the structural elements recited as part of the ACU have nothing to do with the claimed function of "receiving signals." As the defendants note, radio receiver 517, a substructure of the ACU, performs the function of receiving signals.

This disconnect between the defined structure of "control unit," and the structure linked to the "receiving" function cuts against D's argument that this is a means-plus-function term. To resolve this dispute, the court gives this term its plain and ordinary meaning and separately defines "control unit" consistent with the structure defined in the specification.

[3] The parties agree that this is a means-plus-function term. The plaintiff asserts that the function should be given its plain and ordinary meaning, "storing automatic evaluation routines to initiate the

3. The term **"proprietary to the security system"** is construed to mean "useful only with the security systems of the same vendor."[4]

---

automatic transfer of information to a chosen remote user terminal. The defendant argues that the court should clarify the meaning of "automatic evaluation routines." The patent does not specifically define "automatic evaluation routines," but the specification's glossary states the Automatic Monitoring Station ("AMS") "has programmable storage means allowing it to identify events pertaining to security detected by detection devices and carry out actions determined by the nature of the identified event." '690 patent at 5:6–10. This function described in the specification corresponds to the function recited in the claim. Comparing the language in the specification to the claim, it appears "automatic evaluation routines" allow the AMS to "identify events pertaining to security detected by detection devices." The court adopts the defendant's proposed function to the extent necessary to clarify the meaning of "automatic evaluation routines."

The structure must be linked to the claimed function, which in this case is "storing routines" that allow the AMS to perform certain activities. The plaintiff claims that the Alert Generation Database ("AGD") is the only structure linked to the storage of automatic evaluation routines. But the only support the plaintiff provides is Figure 2, which shows the AGD providing information to "Alert Recipients" through an "IP" connection. This is clearly related to the "transfer of information to a chosen remote user terminal," but not clearly related to "storing routines." Because the specification does not identify one structure that performs the function of "storing routines," the court must look more generally at the structures required for the AMS to perform its function.

The specification discloses that the Alarm Monitoring System ("AMSys") is "the intelligence embedded within AMS." '690 patent at 7:27–28. After an alert is received, the AMSys consults the ACU Configuration Database, which contains a "[l]ist of actions to be taken when a particular alert is detected." '690 patent at 7:27–28, 8:17–23. "Having determined the appropriate action to take," the AMSys instructs the AGD to send information to specified Alert Recipients. *Id.* at 7:32–57. The court finds that the structure recited by the specification for this term includes the Alarm Monitoring System, the Alarm Control Unit Configuration Database, and the Alert Generation Database.

[4] The plaintiff proposes the construction, "used only with the security system," and the defendant proposes the construction, "useful only with the security systems of the same vendor." During the *Markman* hearing, the defendant provided a helpful illustration of the differences between the parties' proposed constructions. (*See* D.I. 89 at 72:24–73:12.) Two different types of remote could work with a television system provided by Sony. The first is a remote provided by Sony, which would only be useful with Sony systems—*i.e.* the remote could not be used with other television systems. The second is a universal remote, which could be programmed to be used with Sony systems, but also could be useful for other systems. The defendant argues that "proprietary" only includes the Sony remote, but the plaintiff asserts that it could also include the Sony-compatible universal remote.

The patent specification provides some guidance as to the meaning of "proprietary." The patent notes that in traditional security systems, "the individual components (sensors, security panels, keypads) operate solely within the confines of a single vendor solution. For example, a wireless motion sensor from vendor A cannot be used with a security panel from vendor B. Each vendor has developed sophisticated proprietary wireless technologies . . . with little or no ability for the wireless devices to operate separate from the vendor's homogenous system." '591 patent at 1:57–67. The court finds that this discussion best aligns with the defendant's proposal, "useful only with the security systems of the same vendor." Accordingly, the court adopts the defendant's proposed construction.

3

4. The term "**gateway registry**" is construed to mean "a repository that stores information associated with the gateway device, which may include the associated serial number, the gateway server address, and the account number."[5]

5. The term "**associative binding**" is construed to mean "connection mechanism on the gateway that maps source device properties+values to destination device properties+values without containing code to do data conversion from the source device's data format to the destination device's data format."[6]

6. The term "**initiating, by the gateway, all communications with a network operations server using the assigned server address**" is construed to mean "all

---

[5] The patent identifies the gateway registry as a repository. *See* '871 patent at 2:28–36, 4:14–17, 5:57–61. The specification describes embodiments in which the gateway registry comprises a table of the account number and gateway servers associated with gateway serial numbers. *Id.* at 3:14–17, 4:47–53. But the court cannot limit a claim to its embodiments. The patent does not require the gateway registry to contain all three types of information.

[6] The specification's description of "associative binding" is ambiguous. It contains two headings called "Associative Binding." Under the first heading, it says, "Binding is the process of "connecting" the output of one device (a sensor) to another device (actuator)." '842 patent at 18:31–32. Under the second heading, it says, "The gateway implements a form of associative binding, where a binding (connection) is triggered by the value of a source device property." '842 patent at 18:47–49. The plaintiff uses this to support its construction, "coupling the output of one device (a sensor) to another device (an actuator)." The plaintiff argues that gateway binding is a subset of the much broader category of associative binding.
  The defendant argues that the reverse is true—that associative binding is narrower than both binding and gateway binding. The specification says that gateway binding "can be implemented without associative binding. That may, however, involve the gateway containing code to do the data conversion from the source device's data format to the destination device's data format." '848 patent at 18:40–43. Based on this language, the court agrees that the plaintiff's construction is too broad. If gateway binding can be implemented without associative binding, associative binding cannot encompass all binding described in the patent. In fact, the patent provides the discussion of the gateway "containing code to do the data conversion" as an example of one form of gateway binding that is *not* associative binding. The patent also describes an example of associative binding: "Bindings are kept in a table that maps source device properties+values to destination properties+values." Therefore, the court adopts the defendant's construction.

communications between the gateway and the network operations center server are initiated by the gateway and use the assigned server address."[7]

Dated: April 11, 2016

_____
UNITED STATES DISTRICT JUDGE

---

[7] The plain meaning of this term indicates that all the communications are initiated by the gateway. The prosecution history unequivocally supports—and requires—this conclusion. During prosecution, the patentee consistently argued that all communications between the gateway and the network are initiated by the gateway. (D.I. 85 at A-0181, A-0194, A-0203.) Prosecution disclaimer applies. *Hakim v. Cannon Avent Grp., PLC*, 479 F.3d 1313, 1317–18 (Fed. Cir. 2007).